1

2

3

4 UNITED STATES DISTRICT COURT

5 DISTRICT OF NEVADA

6 TODD R. SMITH,                                    3:07-cv-00396-WGC

7                          Plaintiff,      **FINDINGS OF FACT &**
                                           **CONCLUSIONS OF LAW**
8        v.

9 EDWARD P. OWENS, JAMES D. MOLDER,
   DONALD J. CLARK, and CATHEXES LLC,
10
                          Defendants.
11 _____
   EDWARD P. OWENS,
12
                          Counterclaimant,
13
   v.
14
   TODD R. SMITH,
15
                          Counterdefendant.
16 _____
   JAMES D. MOLDER, DONALD J. CLARK,
17 and CATHEXES LLC,
18                        Counterclaimant,
19 v.
20 TODD R. SMITH,
21                        Counterdefendant.
   _____
22 JAMES D. MOLDER, DONALD J. CLARK,
   and CATHEXES LLC,
23
                          Crossclaimants,
24
   v.
25
   EDWARD P. OWENS and
26 SUMMIT CAPITAL & DEVELOPMENT LLC,
27                        Crossdefendants.
28 _____

# I. BACKGROUND

Plaintiff Todd R. Smith (Smith) originally filed his complaint on September 4, 2007, related to an alleged agreement he entered into with defendants Edward P. Owens (Owens), James D. Molder (Molder), and Donald J. Clark (Clark) to purchase property located at 250 Bell Street (250 Bell St.) in Reno, Nevada in or around April 2006. (Compl., Doc. # 1 at 2 ¶7.) The complaint also named Cathexes LLC (Cathexes), the architectural design firm of Molder and Clark. The Second Amended Complaint is the operative pleading. (Doc. # 44.)

**A. Smith's Second Amended Complaint**

Smith alleges that in April 2006, Smith, Owens, Molder and Clark agreed to purchase 250 Bell St. and to form a limited liability company, 250 Bell St. LLC, to hold the property. (Doc. # 44 at 2-3 ¶¶ 7-8.) In exchange for individual twenty-five percent membership interests in 250 Bell St. LLC, Clark and Molder agreed to contribute architectural and project management services and Smith and Owens agreed to contribute capital in the amount of $100,000 each. (*Id.* at 2 ¶ 7.) 250 Bell St. was to be used to provide office space for Cathexes and for Smith's and Owens' development company, Summit Capital & Development LLC. (*Id.* at 2-3 ¶ 8.)

Smith contends that while he, Owens, Clark and Molder agreed to purchase the property together, in July 2006, Owens, Molder and Clark entered into an agreement to purchase the property without Smith's knowledge or participation, thereby cutting him out of the deal, in breach of their agreement. (*Id.* at 3 ¶ 9.) Thereafter, on or about July 20, 2006, however, the four agreed that after Smith paid $100,000, the property would be re-conveyed to 250 Bell St. LLC and Smith, Owens, Molder and Clark would each receive a twenty-five percent membership interest. (*Id.* ¶ 10.)

On August 9, 2006, in reliance on their agreement, Smith directed his wife to write a check from their joint account in the amount of $100,000, payable to Cathexes. (*Id.* ¶ 11.) On August 10, 2006, Cathexes issued a receipt to Smith, acknowledging it received the $100,000 from Smith "as reimbursement for equity investment in the property at 250 Bell St." which was then owned by Clark, Molder and Owens, but would be converted to a twenty-five percent membership in 250 Bell St. LLC. (*Id.* ¶ 12.) The receipt was notarized and signed by Smith,

Owens, Molder and Clark. (*Id*.)

Cathexes cashed the check and the $100,000 was withdrawn from Smith's account on August 11, 2006. (*Id*. at 4 ¶ 13.) Despite his payment, Smith contends he did not receive his promised twenty-five percent interest in 250 Bell St. LLC, nor did he receive a refund of his $100,000 payment (plus interest from August 10, 2006) despite his demands. (*Id*. ¶¶ 14-15.) Instead, in December 2006, the property was conveyed to Proteros, LLC, which was owned and operated by Molder and Clark. (*Id*. ¶ 16.) Smith never received his membership interest in 250 Bell St. LLC nor a refund of his $100,000 payment. (*Id*. ¶ 17.)

Based on these allegations, Smith asserts the following claims against Owens, Clark and Molder: breach of contract; promissory estoppel, fraud in the inducement, breach of the implied covenant of good faith and fair dealing, and constructive trust. (Doc. # 44 at 7-12.) He asserts claims for conversion and unjust enrichment against Cathexes. (*Id*. at 12-13.)

The Second Amended Complaint includes additional allegations relative to Owens and the limited liability company Smith and Owens formed, Summit Capital & Development, LLC., and a venture Summit Capital & Development LLC allegedly entered into to become a member of North River Development, LLC. (Doc. # 44 at 4-7.) North River Development, LLC, was involved in a project to renovate and manage a property formerly known as the King's Inn and Casino in Reno, and also referred to as the deNovo project. (*Id*. at 6 ¶ 25.) Based on these allegations, Smith asserted claims for breach of fiduciary duty, breach of third party beneficiary contract, and contribution/indemnification against Owens. (*Id*. at 13-15.)

In the Second Amended Complaint, Smith requested the following relief: compensatory damages; enforcement of the obligation of Owens, Molder and Clark to convey the property at 250 Bell St. to 250 Bell St. LLC and to make Smith a twenty-five percent owner of 250 Bell St. LLC; imposition of a constructive trust on twenty-five percent of the profits, proceeds, earnings, rental fees, and/or royalties obtained, directly or indirectly, in connection with activities at 250 Bell St.; punitive damages; Smith's costs incurred in prosecuting this action, including reasonable attorney's fees; pre- and post-judgment interest; all relief to which he is entitled pursuant to Federal Rule of Civil Procedure 54(c); and all other relief the court may deem

1    appropriate. (*Id*. at 16.)

2    **B. Owens' Counterclaim Against Smith and Cross-Claim against Molder, Clark and**

3    **Cathexes**

4          Owens filed a counterclaim against Smith and a cross-claim against Molder, Clark and

5    Cathexes. (*See* Docs. # 19, # 39, # 49.) Summit Capital & Development LLC also filed a cross-

6    claim against Owens. (Doc. # 60.)

7    **C. Molder's, Clark's and Cathexes' Counterclaim against Smith and Cross-Claim against**

8    **Owens and Summit Capital & Development LLC**

9          Molder, Clark and Cathexes also filed a counterclaim against Smith and a cross-claim

10   against Owens and Summit Capital & Development LLC. (Doc. # 47.)

11         In their counterclaim against Smith, they allege that in March 2006, Smith, Owens and

12   Summit Capital & Development LLC entered into a joint venture with Clark, Molder and

13   Cathexes to purchase and develop the 250 Bell St. property and a project located on West

14   Second Street in Reno, Nevada. (Doc. # 47 at 11 ¶ 5.)

15         West Second Street was to be developed with the Summit parties having eighty percent

16   and the Cathexes parties having twenty percent, where the Summit parties were to provide cash

17   and financing and the Cathexes parties would provide design, engineering, permitting and project

18   development and administration, but not cash. (*Id*. ¶ 7.)

19         They contend that development of 250 Bell St. was to be on a "50/50 basis" with the

20   Summit parties (Smith, Owens and Summit Capital & Development LLC) providing upfront

21   cash and arranging financing and the Cathexes parties (Molder, Clark and Cathexes) providing

22   design, engineering, permitting, project administration and development services. (*Id*. at 12 ¶ 6.)

23         The parties also agreed that of the 250 Bell St. building, 9,000 square feet would be

24   leased by Cathexes for its office, and 9,000 square feet would be leased by Summit for its office.

25   (*Id*. ¶ 9.) In addition, the Summit parties were involved in the development of what was referred

26   to as the Kings Inn/deNovo project and the final 6,000 square feet of the 250 Bell St. building

27   was going to be used for Summit Capital & Development LLC's sales office and model unit for

28   this project. (*Id*.)

1    The parties to the joint venture agreed that at the end of the project, the equity investment

2    would be balanced out equally between the two sides. (*Id*. ¶ 8.)

3    According to the Cathexes parties, shortly after the joint venture began, Smith became far

4    less involved and failed to communicate with them. (*Id*. ¶ 9.) In April 2006, the first upfront cash

5    was required for the project for a deposit, which the Summit parties were supposed to pay;

6    however, they did not make the payment, and in order to preserve the project, Cathexes made the

7    payment and continued with design work. (*Id*.) When the second upfront payment came due, the

8    Summit parties failed to make this payment as well, and the Cathexes parties had to obtain the

9    cash to make this payment, on unfavorable and costly terms. (*Id*.)

10   The purchase of 250 Bell St. was supposed to close in July 2006; however, the Summit

11   parties had failed to raise the necessary funds, and Cathexes had to pay to obtain an extension for

12   closing on the property. (*Id*. at 13 ¶ 11.) Ultimately, the Cathexes parties had to come up with all

13   of the cash necessary to close the purchase on the building, in violation of the joint venture

14   agreement that the Summit parties would provide the upfront cash. (*Id*.)

15   Since Owens was cooperating, even though he provided no funds (which he claimed was

16   the fault of Smith), Owens co-signed the closing documents for the purchase of 250 Bell St. with

17   Clark and Molder. (*Id*. ¶ 12.) As of August 2006, the Cathexes parties had more than $200,000

18   invested in the project, and had a $10,000 per month obligation on the purchase of the property.

19   (*Id*. ¶ 13.)

20   Nevertheless, Smith and Owens indicated they still wanted to be a part of the joint

21   venture. The parties all met in Reno in early August 2006. (*Id*. ¶ 14.) Smith and Owens agreed

22   they wanted to stay in the project and that they would each put in $200,000 cash and would

23   assume the original obligations under the joint venture agreement. (*Id*.)

24   As part of their renewal of the joint venture, the Summit parties insisted on a redesign of

25   250 Bell St. and requested additional space. (*Id*. ¶ 15.)

26   Approximately two weeks after the meeting in Reno, Smith sent in a payment of

27   $100,000 on behalf of the Summit parties; however, no additional money was ever paid. (*Id*.)

28   Following receipt of the funds, Smith became unavailable and had virtually no further

- 5 -

communication with the Cathexes parties. (*Id.* ¶ 17.) Owens continued to cooperate, but did not pay his joint venture financial obligations, for which he blamed Smith. (*Id.*)

In early November 2006, the redesign for 250 Bell St. was completed and drawings were ready to submit to the building department. (*Id.* ¶ 18.) In addition, documents were prepared for a Small Business Administration (SBA) loan, and leases were prepared and ready to execute for the parties. (*Id.* at 13-14 ¶ 18.)

From September to November, Smith was out of touch, and the Cathexes parties were advised by Owens that the Owens-Smith-Summit venture was falling apart. (*Id.* at 14 ¶ 18.) By the end of November, Owens notified Molder, Clark and Cathexes that the Summit parties would not be putting any more funds into the joint venture and were not going to lease the space at 250 Bell St. as previously agreed. (*Id.* ¶ 19.)

Due to the withdrawal from the project of the Summit parties, the Cathexes parties had to redesign the space for a third time, which was completed in February 2007, when the building permit was obtained, the construction loan closed and construction began at 250 Bell St. (*Id.* ¶ 21.)

The Cathexes parties contend their damages include the money they put into the project that the Summit parties were supposed to have contributed, the costs of multiple redesigns of the property, financing and extension costs obtained on unfavorable terms, the expense of having to maintain Cathexes' Holcomb Avenue office, the cost of the new property, loss of lease revenue and other damages to be proven at trial. (*Id.* at 14-15 ¶ 23.)

With respect to the West Second Street project, they contend that due to the Summit parties' non-performance, the project collapsed. (*Id.* at 15 ¶ 25.) The Summit parties failed to pay an outstanding legal bill for services from the Reno law firm of Burton, Bartlett & Glogovac, which Cathexes paid even though it was the Summit parties' responsibility. (*Id.*) In addition, the Cathexes parties claim they incurred over $75,000 in design costs and in excess of $4,000 in other costs including printing. (*Id.*)

Finally, the Cathexes parties claim they were required to retain the services of counsel and that the Summit parties should be liable for their legal fees incurred in this action. (*Id.*)

1    They assert the following claims against Smith: breach of contract, breach of the duty of

2    good faith and fair dealing, breach of fiduciary duty, and fraud. (*Id.* at 15-17.) Prior to trial, they

3    abandoned their fraud claim. In their cross-claim against Owens and Summit Capital &

4    Development LLC, they assert the following claims: breach of contract, breach of the duty of

5    good faith and fair dealing, breach of fiduciary duty, and indemnity (against Owens only). (*Id.* at

6    17-19.)

7    **D. Bankruptcies of Owens and Molder; Remaining Parties and Claims**

8    The trial in this matter was originally set for November 17, 2009; however, the action

9    was stayed when Owens filed for bankruptcy protection. (Docs. # 126, # 128.) A notice was filed

10    on January 31, 2012, indicating that Owens had received a discharge from the bankruptcy court.

11    (Doc. # 131.) Before the action could resume, however, the court was advised that Molder had

12    also filed for bankruptcy protection on September 20, 2012. (Doc. # 146.) The action was stayed

13    again pursuant to the automatic stay entered by the bankruptcy court. (*Id.*) Molder was granted a

14    discharge from the bankruptcy court some time near the beginning of January 2013. (Doc. #

15    147.)

16    Eventually, all claims asserted by and against Owens and Molder were discharged, and

17    Owens and Molder were dismissed as parties as a result of their respective bankruptcy

18    proceedings. (*See* Docs. # 143, 164.) Therefore, the following parties and claims remained:

19    Smith's claims against Clark and Cathexes (Doc. # 44); Clark's and Cathexes' counterclaim

20    against Smith and cross-claim against Summit Capital & Development LLC (Doc. # 47).

21    The remaining parties subsequently consented to the undersigned being assigned this case

22    for all purposes. (See Doc. # 165.) A bench trial was held between September 8 and 11, 2014.

23    (*See* Minutes at Docs. # 193, # 194, # 195 and # 196.) Smith and Summit Capital &

24    Development LLC were represented at trial by Craig R. Carlson, Esq., of Porter Wright Morris

25    & Arthur LLP.[1] Clark and Cathexes were represented by W. Chris Wicker, Esq., of Woodburn

26    and Wedge. The court heard testimony, received evidence and considered argument by counsel.

27    At the conclusion of the trial, the court announced that it would take the matter under submission

28

---

[1] Smith's local counsel was Leigh T. Goddard of McDonald Carano Wilson LLP.

and would announce its findings on October 6, 2014, and thereafter issue its written findings of fact and conclusions of law. The court now issues its formal written findings of fact and conclusions of law.

## II. FINDINGS OF FACT

**A. Background and the deNovo Project**

The parties were involved in three projects that are relevant to this case: the Kings Inn/deNovo project, the West Second Street project and 250 Bell St. While Clark and Cathexes do have a claim for the recovery of the attorney's fees paid to Burton, Bartlett and Glogovac and drawing fees incurred on the West Second Street project, the parties' claims related to 250 Bell St. are the focal point of this case. In fact, there are no damages claims in this case related to the Kings Inn/deNovo project, but the parties' involvement in that project provides useful background information leading to the West Second Street and 250 Bell St. ventures.

Smith and Owens met in or around 2004 when they were both working on a project in San Francisco; Owens was working for the Hunter Group on construction/development and Smith was working on the financing side. The two decided to get together and form a development and management company to work on projects in the western United States, including projects in Reno, Nevada. Thus, they formed Summit Capital & Development LLC and Summit Capital & Development Management Company, in which Smith and Owens were each fifty percent members. Summit Capital & Development LLC was the investing vehicle while Summit Capital & Development Management Company was the managing member. An operating agreement was entered into (Ex. P3)[2] as well as a contribution agreement by Owens (Ex. P4). They sought to become involved in a project in Reno that involved rehabilitation and renovation of the old Kings Inn Hotel and Casino referred to both as the Kings Inn and deNovo project. Owens had been working on this project with his former employer, the Hunter Group, as project manager. Owens had hired Cathexes (the architectural firm owned by Clark and Molder) for the project.

---

[2] The trial exhibits were submitted as Plaintiffs' ("P") and Defendants' ("D"); therefore, the court will refer to the exhibits utilizing the parties' identification mechanism ("P" or "D") and the corresponding exhibit number.

The deNovo project was being spearheaded by North River Development LLC. Summit Capital & Development LLC sought to replace the Hunter Group's entity involved in the project, CWR, in the North River Development LLC Operating Agreement in order to have control over the project. Within Summit Capital & Development LLC, Owens' role was to be the "boots on the ground" managing the construction/development aspect of the business and Smith was to utilize his experience and background to obtain financing for the project. In connection with the deNovo and West Second St. projects, Smith communicated with various commercial financial lenders to try to obtain financing for the project, including Mitsui Sumitomo, and others. To get an initial influx of capital, Summit Capital & Development LLC obtained a note from Ascendiant Capital (which was owned by Mark Bergendahl and his mother), and Smith and Owens personally guaranteed this note. Ultimately, Ascendiant ended up suing Smith and Summit Capital & Development LLC on the note, but not Owens, and judgments were obtained. The deNovo project ultimately failed as a result of a lack of financing.

**B. West Second Street**

When Smith became involved with the deNovo project, Owens introduced him to Clark and Molder who were performing the architectural services for the deNovo project. Smith, Owens, Clark and Molder started discussing other development projects they might be able to collaborate on. Specifically, they talked about developing a corridor of downtown Reno located in and around West Second Street. At trial the parties disputed who was ultimately involved in this joint venture. According to Smith, it was a joint venture between entities. According to Clark, the West Second Street project was a venture between the individuals and their respective companies, with Clark and Molder each holding ten percent and Smith and Owens each holding forty percent. He described the roles of the parties as follows: (1) Clark and Molder would contribute architectural and design services; (2) Owens would be involved in the construction/development aspect of the project; and (3) Smith would be in charge of obtaining financing.

The executed operating agreement for West Second, LLC admitted at trial (Ex. P14) has an effective date of November 1, 2005, and was signed by Clark and Molder on behalf of their

Nevada limited liability company, Proteros, LLC, and by Owens on behalf of Summit Capital & Development LLC. According to the agreement, the ownership interests were divided with Proteros, LLC holding a twenty percent interest and Summit Capital & Development LLC holding an eighty percent interest. The agreement contains an integration provision stating that it "constitutes the entire agreement among the Members pertaining to the subject matter hereof" and supersedes all prior and contemporaneous agreements and undertakings of the Members in connection therewith." In addition, the agreement states that it "may not be modified or amended except in a writing executed by all parties[.]" The court finds that this operating agreement governs the West Second Street project.

This project, like the deNovo project, ultimately failed as a result of a lack of financing which Clark and Cathexes attribute to Smith and Summit Capital & Development LLC. As a result of the West Second Street project's failure, Clark and Cathexes seek to recover damages including $13,534 Cathexes paid to the law firm of Burton, Bartlett & Glogovac which it contends was the responsibility of Smith and Summit Capital & Development LLC, whom they contend were supposed to provide the cash relative to this project. Clark and Cathexes also claim they incurred well over $100,000 in expenses for architectural drawings undertaken by Cathexes on the project.

Under the operating agreement, the members of West Second LLC were Proteros, LLC and Summit Capital & Development LLC. While Clark currently holds a 100% membership interest in Proteros, LLC, the entity is not a party to this action and no recovery can be had by Clark or Cathexes on this claim.

**C. 250 Bell St.**

**1. Background**

Smith, Owens, Clark and Molder also entered into discussions about purchasing a building together in order to provide office space for their respective companies. This decision came about because the parties were working together on the deNovo project and now the West Second Street project. In addition, Summit Capital & Development LLC had begun sharing office space with Cathexes at its location on Holcomb Avenue in Reno, and it was working out

well for all involved; however, Cathexes had to move out of its Holcomb Avenue location and needed to find a new office space and the parties thought it made sense to try to buy a building together. They eventually settled on a property located at 250 Bell St., in large part because it was located within the area of development of the West Second Street project and in close proximity to the deNovo project. The property was for the most part in the form of a warehouse and would need to be converted into Class B office space for the utilization of the parties. In addition to housing office space for Cathexes and Summit Capital & Development LLC, Smith/Owens/Summit Capital & Development LLC wanted the building to house a showroom/model unit for the deNovo project  as well as an apartment for Smith to use when he was working in Reno. All of the parties acknowledged at trial that central to the decision to purchase the property at 250  Bell St. was the notion that Cathexes and Summit Capital & Development LLC, and their respective principals, would be leasing out the space.

Key issues at trial included: (1) who were the parties to the agreement to purchase and renovate the property at 250 Bell Street; and (2) what were the essential terms of the agreement.

**2. Smith's Version of Events**

Smith maintains that this was a four-person, individual venture between Smith, Owens, Molder and Clark whereby Smith and Owens would contribute cash and Molder and Clark would contribute architectural services, the property would be conveyed to an entity to be created to hold the property, 250 Bell St. LLC, and each of the four individuals would receive a twenty-five percent ownership interest in the LLC. Smith contends that instead of the four individuals purchasing the building and conveying it to 250 Bell St. LLC, with each of the four holding a twenty-five percent interest, Owens, Clark and Molder purchased the property without Smith.

Subsequent to the purchase, Smith, Clark, Owens and Molder had a meeting, and according to Smith, it was agreed that if Smith and Owens each put in $100,000, the property would then be conveyed to 250 Bell St. LLC, and they would each then receive their twenty-five percent membership interest in the LLC, and therefore, a twenty-five percent interest in the property. Smith then directed his wife to send a check for $100,000, payable to Cathexes, out of

their joint account, which she did, on August 9, 2006. Smith contends that on August 10, 2006, he got a receipt for the $100,000 reimbursement for an equity interest in 250 Bell Street, and was promised it would be converted into a twenty-five percent membership interest in 250 Bell St. LLC. Despite his payment of the $100,000, Smith claims the property was not conveyed to 250 Bell St. LLC, but was eventually conveyed to Proteros, LLC, which was owned and operated by Clark and Molder, and he never received his twenty-five percent interest in 250 Bell St. LLC and never got back his $100,000, in breach of the agreement.

### 3. Clark/Cathexes Version of Events

According to Clark/Cathexes, this was not just an agreement between the four individuals to purchase the property and receive a twenty-five percent interest. Instead, this was a joint venture agreement entered into by Smith, Owens, and Summit Capital & Development LLC on one side, and Clark, Molder and Cathexes on the other side. The parties agreed that the Cathexes side would provide architectural services for the project and the Summit side would provide the cash needed for acquisition of the property and closing on the loan, and at the end of the day the equity investment would be balanced out and Summit and Cathexes would lease the building.

### 4. Court's Findings of Fact re: 250 Bell St.

Unfortunately, there was no written agreement governing this transaction. While various iterations of an operating agreement for 250 Bell St. LLC were circulated, none were ever executed. Therefore, the court was required to determine, based on the testimony and evidence presented at trial: whether an agreement was formed, by whom, and the essential terms.

The court does not agree with Smith that the agreement between the parties relative to the 250 Bell. St. property was limited to the matters mentioned in the receipt received by Smith after he paid his $100,000. Instead, the court accepts Clark/Cathexes' depiction of the agreement: that the parties, Owens/Smith/Summit Capital and Development LLC and Clark/Molder/Cathexes decided based on their mutual need for office space, their collaboration on various projects, and the proximity of the 250 Bell St. property to these projects, that they should purchase 250 Bell St., a building that could serve their respective needs. There is no doubt that the parties determined that the four individuals, Smith, Owens, Clark and Molder, would purchase the

property and have it remodeled and built out to their specifications. It would then be conveyed to 250 Bell St. LLC (or some iteration thereof), and each of the four individuals would receive a twenty-five percent membership interest in the LLC. The testimony was clear that the Summit side was to provide the capital contributions necessary to acquire the building and the Cathexes side would contribute architectural and design services.

That, however, was not the end of the agreement. Of paramount importance to the agreement was the decision of Smith, Owens, Clark and Molder, as individuals, and as members able to bind their respective companies, Cathexes and Summit Capital & Development LLC, that they would cause Cathexes and Summit Capital & Development LLC to lease and occupy 250 Bell St. The space allocation was to be 50/50, although it later changed so that more square footage was assigned to the Summit side at their request, to accommodate the deNovo showroom/model and Smith's personal apartment. The parties also all agreed that at the end of the day, the equities would be balanced out between them.

Even in opening argument, Smith's counsel acknowledged that the deal envisioned the parties roles as follows: Smith and Owens were to contribute cash and Clark and Molder were to contribute architectural services, the building would be acquired and renovated, and Cathexes and Summit Capital & Development LLC  were to lease and occupy the building. This, however, is not what occurred.

The purchase agreement for 250 Bell St. was signed in May 2006. Cathexes paid the first deposit toward closing the deal in the amount of $10,000.

While Smith/Owens/Summit were to come up with the capital contributions necessary to acquire the property, this did not occur. Instead, the testimony revealed that Smith failed to provide any initial capital contribution. In addition, Summit Capital & Development LLC itself had no funds to contribute. Owens, individually, had no capital to contribute because he was fronting cash for Summit Capital & Development's expenditures, including employee/contractor salaries, presentations to financers sought for the deNovo and West Second St. projects, rent for Summit Capital & Development's office space, and other expenses. Summit had planned on using developer fees that it obtained from the deNovo and West Second St. projects to fund the

lease payments for Summit Capital & Development LLC's occupancy of the 250 Bell St. Property. In fact, Summit Capital & Development LLC asked Cathexes to re-design the space to be occupied to allow for the construction of a showroom/model for the deNovo project and an apartment for Smith to occupy when he was working in Reno. The Summit side's ability to pay, therefore, was predicated on Smith obtaining financing for those projects, which never occurred.

When the Summit side did not come up with the money for closing, Cathexes had to pay for two more extensions of the closing date, in the amount of $10,000 each, and these payments were non-refundable. Closing was extended to July 19, 2006. After the second extension was given, the buyer was unequivocal that there would be no further extensions, so they had to close on the building or lose it, along with the cash and effort already put into it, which included thousands of dollars in drawings Cathexes had created for the space.

Smith was in Reno around July 4, 2006, and said that he would be back for the closing of the building; however, as the time approached for closing, Clark sent Smith an email on July 10, 2006, asking him whether he was going to come up with part of the down payment for closing, but never received a response from Smith. Owens also placed calls to Smith which went unreturned. According to Clark and Owens, Smith was aware of the closing date, but because they had not heard to him leading up to that date they appeared at the closing with two sets of documents: one with Smith's name on them and one without. July 19, 2006 came and Smith/Owens/Summit failed to put up any money for closing and Smith did not appear for closing. The Cathexes side had to come up with all of the cash for closing, including a last minute $100,000 loan from Nick Pavich with a twelve percent interest rate. Clark testified that Cathexes ultimately had to come up with approximately $345,000 to close on the property (the breakdown of the $345,000 is discussed, *infra*). The closing documents were signed by Clark, Molder and Owens. The parties always intended that Smith would be an owner of the building, but they could not get a hold of him and he did not show up for closing, so Clark, Molder and Owens had to go forward with the closing without him (as they had been told they would receive no further extensions).

Owens conveyed this to Smith, and Smith was upset. A meeting was convened between

1    Smith, Owens, Clark and Molder in Reno in early August to determine how to proceed. The

2    pivotal question to the Summit side at this meeting was in essence: "Are you in or are you out?"

3    The Summit side took a few days to discuss the matter among themselves and ultimately let the

4    Cathexes side know that they were "in." Clark presented information to the group showing how

5    much equity Cathexes had already put into the building, and it was agreed that the Summit side

6    would put in $200,000 to balance out the equity investment already made by the Cathexes side.

7    Owens said he would put in $100,000 and Smith also agreed to put in $100,000.

8         On August 9, 2006, Smith directed his wife to write a check from their joint account

9    payable to Cathexes in the amount of $100,000; she did so, and it was  sent to Cathexes. (Ex.

10   P99.) Cathexes received the check and deposited it. Clark and Smith collaborated to come up

11   with a memorialization of Smith's payment and on August 10, 2006, a document was issued by

12   Cathexes and signed by Molder, Clark, Owens and Smith, stating the following:

13          CATHEXES LLC. is in receipt of $100,000 from Todd Smith as reimbursement
            for equity investment in the property at 250 Bell St., Reno, NV 89503. This
            property is currently owned by Donald J. Clark, James D. Molder, and Edward P.
14          Owens. This will be converted to 25% membership in 250 Bell St. LLC, which is
            the entity developing the expansion of the project.

15   (Ex. P100.)

16

17        Smith contends that this receipt alone stands for the proposition that he should have

18   gotten a twenty-five percent interest in the building and because he did not, Clark/Cathexes are

19   in breach of the agreement. This contention, however, ignores the clear intention of the parties

20   that the Summit side was to have come up with the capital needed to acquire the property *and to

21   cause their company to occupy at least half of the space*, *and* that the equities were to be

22   balanced out between the Summit side and the Cathexes side. This is illustrated by Clark's letter

23   to Owens and Smith, sent shortly after Smith submitted his $100,000, where he summarizes the

24   parties' "expectations." (Ex. P53.) In that letter, Clark stated that the Cathexes side had put in

25   $355,000 in cash (including the $100,000 loan from Nick Pavich), $135,000 in drawings

26   (architectural, structural, and interior), $16,000 in electrical engineering, $40,000 in "hard

27   money" for closing (another hard money loan Clark testified that he had to obtain to close), and

28   approximately $18,000 in interest on the funds over the five or so months. The letter details other

     costs that they anticipated incurring in the future, and for which they all would be "jointly

responsible for." This letter continually reiterates the need for balance among the members of the joint venture agreement.

The letter also further demonstrates that it was the intent of the parties to have Summit Capital & Development LLC and Cathexes lease and occupy the building. Clark testified that this letter was sent in August 2006, shortly after Cathexes received Smith's $100,000 check on August 9, 2006. The letter discusses finalizing space design to go to the building department the following week, and wrapping up lease discussions "over the next few days" so that the leases could be executed. At this time, based on discussions between the parties, the letter sets forth that they had determined that the total rent on the building would be approximately $28,000 per month.

Smith never responded to this letter.

Smith and Owens had previously arranged and attended a lavish meeting in Lake Tahoe in September 2006 to try to woo "the brass" from various finance companies to provide financing for deNovo and West Second St. projects. At that point, it was not clear that financing would be obtained. Also in September 2006, Smith received email communications from persons whom he was soliciting to provide financing for deNovo and West Second Street that indicated hard money investors were "VERY nervous of the real estate market" and would only provide investment under difficult terms.

Also during the period of time between July and October 2006, the parties began working on securing a Small Business Administration (SBA) loan and construction loan. The SBA lender required, and the parties were all aware, that in order to obtain an SBA loan, the property had to be leased by Summit Capital & Development LLC and Cathexes. The SBA loan was finally approved in October 2006, and Clark, Molder, Owens, and Summit Capital & Development LLC all signed the loan application.

Owens never paid his $100,000. He testified that he anticipated, based on Smith's representations, that financing was going to come through for deNovo, and Summit Capital & Development LLC would get paid and he would be able to put in his $100,000, but the financing never materialized.

1  As a result of Smith's inability to obtain financing, and Smith's apparent lack of

2  communication in this regard, the relationship between Smith and Owens began to deteriorate

3  between the late summer/fall of 2006 and winter of 2006/2007. This is evidenced by an

4  October 30, 2006 email from Owens to Smith where Owens asks Smith in essence to say one

5  way or another whether he could obtain the financing. Smith characterized this email as Owens

6  just "kicking and screaming"; however, it is clear at that point that there was no indication that

7  financing was coming contrary to Smith's various representations to Clark and Owens that it was

8  imminent.

9  Later in November 2006, Owens set up a meeting with Clark where he told Clark that

10  Summit Capital & Development LLC was not a good partner for Cathexes and needed to get out

11  of the deal. He represented that his relationship with Smith had deteriorated, that Summit Capital

12  & Development had no funding, could not contribute to the acquisition of 250 Bell St. and could

13  not lease out its portion of the building.

14  At some point after that meeting Owens conveyed what had occurred in this meeting to

15  Smith. Even later in November, Smith came to Cathexes' Reno office and had a conversation

16  with Clark about Summit Capital & Development LLC being out of the 250 Bell St. deal, and

17  Smith asked for his $100,000 back. Clark did not give him an answer because Owens had

18  represented that he would "deal with" Smith; however, at no point during their conversation or

19  thereafter did Smith ever indicate that he/Owens/Summit Capital & Development LLC could

20  perform as promised under the joint venture agreement, *i.e.*, that they could make any further

21  capital contribution in furtherance of acquisition of the property or that Summit Capital &

22  Development LLC could in fact lease its portion of the building.

23  When Owens/Smith/Summit Capital & Development LLC backed out of the 250 Bell St.

24  deal, in Clark's words, "there was no going back" for Clark/Molder/Cathexes. They had already

25  invested a significant amount of cash into the building, a non-refundable earnest money deposit,

26  two additional non-refundable earnest money deposits to extend the closing date, closing costs,

27  extensive work on architectural and design drawings and re-drawings to design the space that

28  Cathexes and Summit Capital & Development were going to occupy.

1    Now that Smith/Owens/Summit Capital & Development had backed out of the deal,

2  Clark/Molder/Cathexes were stuck with a building that was twice as big as that which they

3  needed. Testimony was given that efforts were made to mitigate damages by looking for tenants

4  to take the space that the Summit side was to have occupied. Unfortunately, this all occurred

5  during the Great Recession and obtaining tenants in an economy that was rapidly spiraling

6  downhill for a building that was not in the best area to begin with was not easy (not to mention

7  that this ultimately resulted in the dissolution of Clark and Molder's partnership and in Molder

8  filing for bankruptcy protection).

9    As a result, the SBA loan had to be re-written with only the Cathexes side. The SBA loan

10  and construction loan were ultimately approved and closed and the remodel of the building took

11  place. Cathexes was able to occupy the building in summer of 2007.

12    As indicated above, the parties anticipated that the rent to be paid for 250 Bell St. by

13  Cathexes and Summit Capital & Development LLC was $28,000, with Summit Capital &

14  Development's Share of that being $14,000 per month or $168,000 per year. Clark/Cathexes

15  have calculated their damages out for five and a half years. Therefore, the rent that would have

16  been paid by Summit Capital & Development LLC over five and a half years would have been

17  $924,000. Clark/Cathexes were able to mitigate their damages by obtaining subleases for the

18  building in the amount of $492,492 over the five and a half year time period. As such,

19  Clark/Cathexes lost $431,508 (net) in rent it would have otherwise received from Summit

20  Capital & Development LLC.

21    Clark/Cathexes incurred $202,444 in costs as a result of the Summit Side pulling out of

22  the building (including drawings, design, re-design, engineering, etc.) which were not contested

23  by Smith/Summit Capital & Development LLC. In addition, Clark/Cathexes incurred $9,000 in

24  interest on the loan from Nick Pavich. Thus, the total costs incurred (exclusive of the $431,508

25  in lost rent) are $211,444. Clark/Cathexes provide a setoff from the hard costs of $100,000, for

26  the amount contributed by Smith. This brings the total for the costs incurred to $111,444. The

27  notes on the building were in the amount of $2,284,000. (Ex. P168.) As of 2013, the building

28  appraised at $1,600,000. Therefore, there is no equity in the building. Accordingly, the amount

1  owed to Clark/Cathexes including hard costs incurred and lost rents is **$542,952**, plus

2  pre-judgment interest.

3  ### III. CONCLUSIONS OF LAW

4  **A. Smith's Claims against Clark**

5  **1. Breach of Contract/Promissory Estoppel**

6  In Nevada, a plaintiff seeking to recover for breach of contract must establish: (1) the

7  existence of a valid contract, (2) performance by the plaintiff, (3) breach by the defendant, and

8  (4) damage as a result of the beach. *See Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 919-20 (D.

9  Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 405 (Nev. 1865)); *Anahuac Mgmt. v. Mazer*,

10 No. 2:09-cv-01590-RLH-PAL, 2012 WL 1142714, at * 3 (citing *Calloway v. City of Reno*, 116

11 Nev. 250, 993 P.2d 1259, 1263 (2001)). "Basic contract principles require, for an enforceable

12 contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*,

13 121 Nev. 668, 672, 119 P.3d 1254, 1257 (Nev. 2005) (citation omitted).

14 At trial, Smith confirmed that the damages he seeks are the return of his $100,000 equity

15 contribution, plus interest at a reasonable rate to be determined by the court, and his attorney's

16 fees incurred in prosecuting this action; however, the court finds that Clark did not breach the

17 agreement with respect to 250 Bell St.

18 First, Smith/Owens/Summit Capital & Development LLC agreed that they would come

19 up with the cash necessary to close on the building. This indisputably did not occur and

20 Clark/Molder/Cathexes were forced to scramble to come up with the money. Next, Smith

21 complains that he was left out of the closing; however, the testimony was clear that Smith was

22 advised of the closing date, was unavailable and failed to return phone calls and emails during

23 this time, and failed to show up for the closing in Reno. In fact, Clark, Molder and Owens had

24 two sets of documents prepared for the closing, one in the event Smith showed up, and one if he

25 did not. The ended up using the latter set. Then, when the parties had a discussion about whether

26 the joint venture would go forward, Smith/Owens/Summit renewed their commitment to

27 contribute the cash in exchange for their membership interest in the building. They were also

28 required to cause Summit Capital & Development LLC to lease and occupy the building.

1    While Smith did put up $100,000 of the $200,000 promised by the Summit side, the

2  remaining $100,000 was never provided and Owens notified Clark/Cathexes and Molder in

3  November 2006 that the Summit side could not complete its performance. When Smith spoke

4  with Clark shortly thereafter, he said nothing and did nothing to demonstrate otherwise. In fact, it

5  was clear at this point in time that Smith and Summit Capital & Development LLC had not

6  obtained financing for the deNovo and West Second Street projects, which would have allowed

7  them to proceed with the 250 Bell St. transaction, including occupancy as a co-tenant of the

8  building. Nor was there any reliable indication this was going to occur anytime in the near future,

9  when the remaining steps for the purchase and renovation of the 250 Bell St. purchase were to

10  take place.

11    This conduct evidenced a clear intention on the part of Smith/Owens/Summit Capital &

12  Development LLC to repudiate the contract. *See Cladianos v. Friedhoff*, 69 Nev. 41, 46, 240

13  P.2d 208, 210 (1952) (quoting *Lake Shore & M.S. Ry. Co. v. Richards*, 38 N.E. 773, 779 (Ill.

14  1894)) (prevention of performance may be indicated by "'any acts, conduct, or declarations of the

15  party, evincing a clear intention to repudiate the contract, and to treat it as no longer binding.'");

16  *see also Mobley v. New York Life Ins. Co.*, 295 U.S. 632, 638 (1935) ("Repudiation by one party,

17  to be sufficient in any case to entitle the other to treat the contract as absolutely and finally

18  broken and to recover damages as upon total breach, must at least amount to an unqualified

19  refusal, or declaration of inability, substantially to perform according to the terms of his

20  obligation.").

21    As such, the obligation to convey the property to 250 Bell St. LLC, in which Clark,

22  Molder, Smith and Owens each received a twenty-five percent membership interest was excused

23  when Smith/Owens/Summit Capital & Development LLC prevented that performance with their

24  anticipatory repudiation. *Cladianos*, 69 Nev. at 45, 240 P.2d at 210. Therefore, there was no

25  breach of the joint venture agreement by Clark and Cathexes.

26    Incidentally, because the court finds that there was a valid and enforceable contract,

27  Smith does not have a promissory estoppel claim against Clark.

28  ///

1

2. **Fraud in the Inducement**

2    To establish a fraud in the inducement claim, Smith was required to prove the following

3    elements by clear and convincing evidence: (1) a false representation by Clark; (2) Clark's

4    knowledge that the representation was false; (3) Clark intended to induce Smith to  act; (4)

5    Smith's justifiable reliance on the misrepresentation; and (5) resulting damage. *J.A. Jones Const.*

6    *Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 290-91, 89 P.3d 1009, 1018 Nev. 2004)

7    (citations omitted).

8    The court finds there was no evidence at trial to support Smith's claims of fraud in the

9    inducement against Clark. Contrary to Smith's contention that the Cathexes side knew they were

10    not going to convey the property to 250 Bell St. LLC, the evidence demonstrated that the parties

11    always intended to do so and to make the individuals twenty-five percent members in the entity.

12    That was clearly the intention, at least until the Summit side indicated it was not going to

13    complete its performance. Therefore, Smith's claim of fraud in the inducement against Clark

14    fails.

15

3. **Breach of the Implied Covenant of Good Faith and Fair Dealing**

16    In Nevada, "[e]very contract imposes upon each party a duty of good faith and fair

17    dealing in its performance and execution." *A.C. Shaw Constr., Inc. v. Washoe County*, 105 Nev.

18    913, 914, 784 P.2d 9 (Nev. 1989). "Where one party to a contract 'deliberately countervenes the

19    intention and spirit of the contract, that party can incur liability for breach of the implied

20    covenant of good faith and fair dealing.'" *Morris v. Bank of America Nevada*, 110 Nev. 1274,

21    1278, 886 P.2d 454, 457 (Nev. 1994). To prevail on this claim, a plaintiff must establish: (1) the

22    plaintiff and defendant were parties to a contract; (2) the defendant owed a duty of good faith to

23    the plaintiff; (3) defendant breached that duty by performing in a manner that was unfaithful to

24    the purpose of the contract; and (4) plaintiff's justified expectations were denied. *Perry v.*

25    *Jordan*, 111 Nev. 943, 948, 900 P.2d 335, 338 (Nev. 1995); *Hilton Hotels Corp. v. Butch Lewis*

26    *Productions, Inc.*, 107 Nev. 226, 232, 808 P.2d 919, 922-23 (Nev. 1991).

27    There is no evidence that Clark acted in anything other than good faith his dealings with

28    Smith related to the joint venture agreement for 250 Bell St. It was Smith/Summit Capital &

1    Development LLC who were in breach of the agreement and not Clark, and Smith is "not in

2    good conscience" entitled to the property; therefore, this claim also fails.

3            **4. Constructive Trust**

4            Smith's constructive trust claim is based on the contention that the Cathexes side

5    wrongfully failed to convey the property to 250 Bell St. LLC and make Smith a twenty-five

6    percent member of the entity; that retention of Smith's ownership rights for which he paid

7    $100,000 would be inequitable; and as such, he has been unjustly denied his share of the profits

8    earned from 250 Bell St. He requests that the court impose a constructive trust on twenty-five

9    percent of the profits, proceeds, earnings, rental fees and/or royalties obtained from 250 Bell St.

10           "A constructive trust has been defined as a remedial device by which the holder of legal

11   title to property is held to be a trustee for the benefit of another who in good conscience is

12   entitled to it. The requirement that a constructive trustee have title (not mere possession) to the

13   property involved is critical to the imposition of a constructive trust." *Danning v. Lum's Inc.,* 86

14   Nev. 868, 478 P.2d 166, 167 (Nev. 1970).

15           The court has found that Smith/Summit Capital & Development LLC were in breach of

16   the agreement and failed to fulfill their obligations under the joint venture agreement, causing

17   damage that significantly exceeds Smith's $100,000 contribution. Moreover, the evidence

18   supports a finding that there was no equity in the property for five and a half years. Importantly,

19   the holder of title to the property is Proteros, LLC, an entity that is not a party to this action. For

20   all of these reasons, Smith's constructive trust claim fails.

21   **B. Smith's Claims against Cathexes**

22           Smith's claims for conversion and unjust enrichment against Cathexes likewise fail.

23           In a claim for conversion, the plaintiff must show that the defendant committed a distinct

24   act of dominion wrongfully over a plaintiff's personal property that was inconsistent with and in

25   derogation or exclusion of the plaintiff's title or rights to the property. *Evans v. Dean Witter*

26   *Reynolds, Inc.*, 116 Nev. 598, 5 P.3d 1043 (2000).

27           Unjust enrichment is "the result or effect of a failure to make restitution of, or for,

28   property or benefits received under such circumstances as to give rise to a legal or equitable

- 22 -

obligation to account therefor." *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 942 P.2d 182, 187 (Nev. 1997). A party seeking to recover for unjust enrichment must establish: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) an acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof. *Unionamerica Mortg. & Equity Trust v. McDonald*, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (Nev. 1981). Unjust enrichment also occurs when "a person has and retains a benefit which in equity and good conscience belongs to another." *Id*. The doctrine of unjust enrichment applies in situations "where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for]." *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 113 Nev. 747, 756, 942 P.2d 182, 187 (Nev. 1997).

The court finds that there was in fact a legal joint venture agreement between the parties, and that Smith/Summit Capital & Development LLC breached the joint venture agreement. As such, Smith does not have a claim for unjust enrichment. Nor can it be said under the facts found by the court that Cathexes wrongfully asserted dominion over the $100,000 payment made by Smith to support a conversion claim. In any event, Smith has been given a setoff against Clark/Cathexes hard cost damages in the amount of his $100,000 contribution.

**C. Clark's and Cathexes' Counterclaim against Smith and Cross-Claim against Summit Capital & Development LLC**

**1. Breach of Contract**

The court finds that a joint venture agreement was entered into by Smith/Owens/Summit Capital & Development LLC and Clark/Molder/Cathexes to acquire the property at 250 Bell St., where the Summit side was to provide the necessary capital contribution to acquire the building, and the Cathexes side was to provide architectural and design services, and each side would cause their respective companies, Summit Capital & Development LLC and Cathexes, to lease and occupy the building.

The Summit side breached this agreement when it notified the Cathexes side in November 2006 that it would not be putting up any additional funding in order to acquire the building and that it would not be leasing or occupying the building as promised.

The damages proximately caused by the breach of the Summit Side are set out in detail in the court's findings of fact, but amount to **$542,952**, plus pre-judgment interest. Judgment will be entered in favor of Clark/Cathexes and against Smith/ Summit Capital & Development LLC.

To the extent Clark/Cathexes have indicated they seek to recover attorney's fees incurred in prosecuting their counter and cross-claims, attorney's fees are only recoverable if provided by statute, rule or contract. *See, e.g., Albios v. Horizon Communities, Inc.*, 122 Nev. 409, 417, 132 P.3d 1022, 1028 (2006). There was no written contract providing for the recovery of attorney's fees relative to 250 Bell St., and Clark/Cathexes provide to no other statute or rule that would warrant an award of attorney's fees under these circumstances. Therefore, they are not entitled to recover attorney's fees in connection with their successful counter and cross-claims.

The court finds that Clark/Cathexes' claim for breach of contract relative to the West Second St. project fails because neither Clark nor Cathexes was a party to the operating agreement for West Second LLC. The members of West Second LLC were Summit Capital & Development LLC and Proteros, LLC. Clark/Cathexes may not recover damages attributable to a breach of the West Second LLC operating agreement. Therefore, their claim to recover in excess of $13,000 for the payment of an attorney's fees bill they attributed to Smith/Summit Capital & Development LLC and approximately $100,000 in design fees and costs related to this project is denied.

### 2. Breach of Duty of Good Faith and Fair Dealing

Again, in Nevada, "every contract imposes upon the contracting parties the duty of good faith and fair dealing." *State, Univ. & College Sys. v. Sutton*, 120 Nev. 972 (2004). A breach of the implied covenant of good faith and fair dealing claim can be maintained where one party to the contract "deliberately countervenes the intention and spirit of the contract." *Morris v. Bank of Nevada*, 110 Nev. 1274, 1278 (1994) (citation and quotation marks omitted).

The court finds that Smith/Summit Capital & Development LLC breached the duty of

good faith and fair dealing implied in the joint venture agreement. While the court concedes that Smith did put $100,000 into the deal, he acknowledged at trial that the intent of the parties was for the Summit side to cover the capital contributions necessary to acquire the property. This did not occur. Instead, Cathexes paid the initial deposit and for two extensions to close on the property. Then, despite being informed of the closing date, Smith was unavailable and did not show up for closing. He did not return phone calls or emails during this time. In addition, he failed to keep the Cathexes side apprised of the fact that he was not able to obtain financing for the deNovo and West Second St. projects, and therefore, that Summit Capital & Development would not be able to fulfill its obligation to put any more money into 250 Bell St. or to lease and occupy the building. This "deliberately counterven[ed] the intention and spirit of the contract" and caused significant damage to the Cathexes side and various other individuals who had relied on their promises. The damages sought by Clark/Cathexes in this claim, however, are duplicative of those sought and awarded for the breach of contract claim.

### 3. Breach of Fiduciary Duty

A breach of fiduciary duty occurs when "one who owes a duty to another by virtue of the fiduciary relationship" engages in tortious conduct which results in injury. *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009). In Nevada a partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit, and includes a registered limited-liability partnership." Nev. Rev. Stat. 87.060 (1). There was testimony and evidence received at trial that Clark/Molder/Cathexes and Smith/Owens/Summit Capital & Development LLC entered into the joint venture to purchase 250 Bell St. with the notion that they would eventually make a profit from the venture. There is a fiduciary duty among partners of "full and frank disclosure of all relevant information for just, equitable and open dealings at full value and consideration." *Clark v. Lubritz*, 113 Nev. 1089, 1095 (1997).

The court finds that Smith/Summit Capital & Development LLC breached the fiduciary duty owed to its partners in the joint venture agreement of full and frank disclosure. The evidence demonstrated that Smith was often unavailable and failed to keep the Cathexes side, and even Owens, apprised of the status of his efforts to obtain financing for the deNovo and

1   West Second St. projects, which was critical to the Summit side being able to fulfill its

2   obligations relative to 250  Bell St. Both Owens and Clark testified that Smith repeatedly told

3   them that financing was imminent or that it would be just two weeks, but it never materialized.

4   When confronted point blank on the issue by Owens, Smith failed to respond, knowing full well

5   that the Summit side was not going to be put forth any funds toward 250 Bell St. or lease and

6   occupy at least half of a large building, which had to be re-designed on at least three occasions

7   pursuant to its requests to accommodate its needs for the deNovo showroom/model and Smith's

8   apartment. Clark/Cathexes also confirmed at trial that the damages sought in connection with this

9   claim are duplicative of those sought in connection with the breach of contract claim.

10   **IV. PREJUDGMENT INTEREST**

11   On October 6, 2014, the court held a hearing where it announced generally its decision

12   following the bench trial in this action, and advised the parties that it would be issuing its final

13   findings of fact and conclusions of law after it received additional briefing from Clark and

14   Cathexes regarding the calculation of prejudgment interest and any response from Smith and

15   Summit Capital & Development LLC. (*See* Minutes at Doc. # 198.)

16   On October 17, 2014, Clark and Cathexes filed their brief regarding prejudgment interest

17   calculation (Doc. # 199), and on October 21, 2014, filed an amendment to their brief (Doc. #

18   200). Smith/Summit Capital & Development LLC did not file an objection or otherwise respond

19   to Clark/Cathexes' filings.

20   Clark and Cathexes are correct that because this action was commenced based on

21   diversity jurisdiction, Nevada's prejudgment interest rates apply. *See In re Exxon Valdez,* 484

22   F.3d 1098, 1101 (9th Cir. 2007). To make an award of prejudgment interest, the court must

23   determine: "(1) the rate of interest; (2) the time when it commences to run; and (3) the amount of

24   money to which the rate of interest must be applied." *Kerala Properties, Inc. v. Familian*, 137

25   P.3d 1146, 1148-49, 122 Nev. 601, 604 (Nev. 2006) (quoting *Schoepe v. Pacific Silver Corp.*,

26   893 P.2d 388, 389, 111 Nev. 563, 565 (Nev. 1995)).

27   In the absence of an agreed term in a contract fixing a different rate of interest, the rate of

28   prejudgment interest is "the prime rate at the largest bank in Nevada, as ascertained by the

1    Commissioner of Financial Institutions, on January 1, or July 1, as the case may be, immediately

2    preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes

3    due ..." *See* Nev. Rev. Stat. 99.040(1).

4    Interest runs from the time the cause of action accrues until the date of judgment. *See*

5    *Ramada Inns, Inc. v. Sharp*, 711 P.2d 1, 2, 101 Nev. 824, 825 (Nev. 1985) (citation omitted). In

6    an action for breach of contract, it begins to accrue on the date the contract was entered into.

7    *Kerala Properties, Inc.*, 137 P.3d at 1148, 122 Nev. at 602 ("under NRS 99.040(1), the proper

8    prejudgment interest rate is the single rate in effect on the date of the transaction, which is the

9    date the original contract was signed"). Clark and Cathexes are correct that the evidence

10   established that the parties entered into the verbal joint venture agreement in the spring of 2006;

11   therefore, the rate to be used is the rate during the period of January 1, 2006 to June 30, 2006.

12   The primate rate on January 1, 2006 was 7.25%.[3] Adding two percent to the prime interest rate

13   brings the rate to 9.25%. Clark and Cathexes' utilized Certified Public Accountant Russell

14   Musselman to calculate the award of prejudgment interest, and concluded that the total

15   prejudgment interest due as of October 17, 2014 is $286,615.87, with prejudgment interest

16   accruing at the rate of $ 137.60 per day. (Doc. # 200 at 6-7.) Thus, the amount of prejudgment

17   interest due as of November 12, 2014 is $290,193.47.

18                               **V. CONCLUSION**

19          The Clerk is directed to **ENTER** judgment in favor of Clark and Cathexes and against

20   Smith and Summit Capital & Development LLC in the amount of **$542,952** plus prejudgment

21   interest in the amount of **$290,193.47,** for a **TOTAL JUDGMENT IN THE AMOUNT OF**

22   **$833,145.47**.

23   **IT IS SO ORDERED.**

24

25   DATED: November 12, 2014                    _William G. Cobb_

26                                               _____

                                                 WILLIAM G. COBB
                                                 UNITED STATES MAGISTRATE JUDGE

27

28

          ─────────────────

          [3] *See* http://www.fid.state.nv.us/Prime/PrimeInterestRate.pdf, last visited November 12, 2014.